**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ABC COMPANY, XYZ COMPANY, and NOAH DOE,<br><br>*Plaintiffs*,<br><br>v.<br><br>LAYERTWO LABS, INC., BLOCKCHAIN EMULATION SERVICES LTD., PAUL SZTORC, and JOHN DOE INVESTORS NOS. 1-99,<br><br>*Defendants*. | Case No. 3:26-cv-01342<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiffs ABC Company, XYZ Company, and Noah Doe (each individually "Plaintiff" and collectively "Plaintiffs"), by and through undersigned counsel, hereby file this Amended Complaint for damages and injunctive relief against LayerTwo Labs, Inc. ("L2L"), Blockchain Emulation Services Ltd. ("BES"), Paul Sztorc ("Sztorc"), and John Doe Investors Nos. 1-99 (the "John Doe Investors") (collectively, "Defendants"), and allege the following:

## INTRODUCTION

1. This action arises from Defendant L2L's announced plan to execute a Bitcoin hard fork, creating a new cryptocurrency initially called "eCash" and now designated as "ECX" in a three-stage rollout which has since begun on August 22, 2026, with a permanent chain launch on or about October 31, 2026. Under Defendant Sztorc's own publicly announced distribution design, every Bitcoin wallet address in existence will receive one ECX token for every Bitcoin held at the snapshot block height — a 1:1 proportional distribution to 100% of Bitcoin holders. Defendants L2L and Sztorc have separately announced that they will "manually reassign" the ECX allocation

attributable to approximately 21,000 out of the 30,000 Patoshi-pattern Bitcoin addresses — dormant addresses associated with Bitcoin's earliest mining activity — away from those addresses and to L2L's own pre-launch investors and supporters.

2. Plaintiffs hold legal title to a portfolio of Patoshi-pattern Bitcoin wallet addresses (the "Subject Addresses") pursuant to Article 7-B of the New York Personal Property Law, governing found and abandoned property. Over a period of nearly two years, Plaintiffs complied with Article 7-B's requirements: they deposited records of the found addresses with the New York City Police Department (NYPD) 17th Precinct across three separate submissions approximately 19, 15, and 14 months before relevant filings, each accepted and confirmed by NYPD property custody receipts; they issued a global notice campaign reaching more than 820 media outlets across 37 countries, with a combined readership and viewership exceeding 250 million people; they sent direct on-chain notice to each Subject Address via OP_RETURN transaction; and they initiated formal quiet title proceedings naming all 39,069 wallet addresses as party-defendants. Plaintiffs' title is the subject of a pending quiet title action in the Supreme Court of the State of New York, County of New York, Index No. 153119/2026.

3. The ECX distribution plan as announced by Defendant Sztorc and L2L is fundamentally inequitable. Defendants L2L and Sztorc have adopted Bitcoin wallet address presence as the criterion for ECX entitlement, distributing ECX to 100% of Bitcoin holders on that basis. L2L and Sztorc will then selectively withhold the ECX allocation attributable to Plaintiffs' addresses — and only Plaintiffs' category of addresses, which spans approximately 0.03% of all Bitcoin wallets — redirecting it to the John Doe Investors. No other Bitcoin wallet holder has been required to produce a court order, prove key possession, or satisfy any condition before receiving their ECX allocation. The selective exclusion of Plaintiffs' addresses from the benefit Defendants

extend to every other holder, while Defendant L2L retains the full commercial benefit of those addresses' participation in the Bitcoin ecosystem that gives ECX its market value, constitutes conversion and unjust enrichment for which equity and law require restitution.

4. The Alpha-stage launch of ECX was scheduled for August 23, 2026, and took place on August 22, 2026. That event distributed redeemable ECX tokens — exchangeable for permanent ECX at the October 31, 2026 full launch — to all Bitcoin holders except those in the Patoshi-pattern address category.

5. Once distributed, blockchain transactions cannot be reversed. Plaintiffs therefore seek emergency injunctive relief requiring Defendants to place the ECX allocation attributable to the Subject Addresses in a court-supervised escrow pending resolution of the merits, in addition to permanent relief as set forth herein.

6. As a result of this inequitable scheme, Defendants have been unjustly enriched at Plaintiffs' expense, retaining for themselves a benefit that would otherwise inure to Plaintiffs by virtue of Plaintiffs' ownership of the Patoshi-patterned coins. Plaintiffs seek restitution and injunctive relief in the form of a temporary restraining order, preliminary injunction, and constructive trust to prevent Defendants L2L, Sztorc, or BES from implementing the ECX distribution in the inequitable format proposed by Defendants L2L and Sztorc.

**PARTIES**

7. Plaintiff ABC Company is a limited liability company organized under the laws of the State of Wyoming and is partly owned by Noah Doe, a New York citizen and resident.

8. Plaintiff XYZ Company is a limited liability company organized under the laws of the State of Wyoming and managed in New York by a New York resident.

9. Plaintiff Noah Doe is a citizen and resident of New York.

10. Upon information and belief, Defendant LayerTwo Labs, Inc. is a Delaware corporation with a principal place of business in 46 Cedarhurst Lane, Milford, CT 06461.

11. Defendant BES is a British Virgin Islands corporation.

12. Defendant Paul Sztorc is, upon information and belief, a citizen and resident of Connecticut.

13. Defendants John Doe Investors 1 through 99 are persons or entities whose identities are currently unknown to Plaintiffs but can be revealed through discovery. Upon information and belief, the John Doe Investors participated in the wrongful acts alleged herein, including in the wrongful exercise of dominion and control over Plaintiffs' property. Plaintiffs will amend this Complaint to identify the John Doe Investors when their identities become known, and will dismiss any Doe Defendant whose citizenship would destroy this Court's jurisdiction.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.

15. Personal jurisdiction exists over Defendant LayerTwo Labs, Inc. in this judicial district pursuant to Fed. R. Civ. P. 4 because LayerTwo Labs, Inc. is a resident of the State of Connecticut as it maintains its principal offices in Milford, CT.

16. Personal jurisdiction exists over Defendant BES in this judicial district pursuant to Conn. Gen. Stat. 52-59b(a) because it has transacted business in this state and because it has committed a tortious act within the state.

17. Personal jurisdiction exists over Defendant Sztorc in this judicial district pursuant to Fed. R. Civ. P. 4 because Sztorc is a resident of the State of Connecticut.

18. Upon information and belief, personal jurisdiction exists over the John Doe Investors because they conduct, solicit and transact business within this judicial district, derive substantial revenue from their commercial activities within this judicial district, and have otherwise made or established constitutionally sufficient contacts in this judicial district to permit this Court's exercise of personal jurisdiction over them.

19. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant LayerTwo Labs, Inc. resides within this judicial district and is a resident of the State of Connecticut.

20. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims raised in this complaint occurred within this judicial district.

## FACTUAL BACKGROUND

**Bitcoin, Hard Forks, and the ECX Fork**

21. Bitcoin is the world's largest cryptocurrency by market capitalization, created in 2009 by the pseudonymous Satoshi Nakamoto. Bitcoin operates on a decentralized blockchain — a distributed, publicly visible ledger of all transactions — and is secured by a proof-of-work mining algorithm. As of the date of this Complaint, Bitcoin has a market capitalization of approximately $1.6 trillion.

22. A Bitcoin hard fork is an event in which a blockchain's protocol rules are changed in a manner incompatible with the prior version, causing the blockchain to split into two separate, independent chains that share the same transaction history up to the point of the split but operate under different rules thereafter. The original Bitcoin network continues unchanged; the new network begins operating under new rules. In every commercially significant Bitcoin hard fork

prior to ECX — including Bitcoin Cash (August 2017, block 478,558), Bitcoin Gold (October 2017, block 491,407), and Bitcoin SV (November 2018, block 556,766) — the fork sponsor distributed the new token proportionally to 100% of Bitcoin holders at the snapshot block height on a 1:1 basis.

23. On April 24, 2026, Defendant L2L's CEO and co-founder, Defendant Paul Sztorc, publicly announced the ECX hard fork. That day, Sztorc posted on the social media platform X (formerly Twitter), in pertinent part, as follows[1]:

a. "BREAKING: New Bitcoin Fork — I am helping create a new Bitcoin Hardfork — dropping this August, called 'eCash'.

  - Your coins will split. For example, if you have 4.19 BTC, then you will get 4.19 eCash.
  - You may sell your eCash — or keep it. Or ignore it!"

Attached as Exhibit A.

24. Within the same X thread dated April 24[2], Sztorc also announced the following:

a. "I've also devised a way that some can invest in this hardfork, now, before the fork-date, in August:

  - Satoshi has 1.1M coins in the so called 'patoshi' pattern.
  - We will be manually reassigning some of these coins (fewer than half) to investors today."

Attached as Exhibit B.

25. All public announcements and information regarding ECX have come from Sztorc, through his social media account on X (@truthcoin). Notwithstanding these public statements,

[1] https://x.com/Truthcoin/status/2047639261453680838?s=46&t=Tihtt8mhCKrIPBsbRvSK1w
[2] https://x.com/truthcoin/status/2047647106739953692?s=46&t=Tihtt8mhCKrIPBsbRvSK1w

Sztorc has averred that "LayerTwo Labs does not hold, administer, or control the ECX allocation or distribution." On September 8, 2026, Sztorc further averred that ECX is controlled by BES "a company limited by shares organized under the British Virgin Islands." See Exhibit C (Interrogatories).

26. BES and L2L entered into a services agreement (the "Services Agreement"), whereby L2L was to create the code and other technological aspects of ECX and help realize the hardfork, and in exchange BES would pay L2L. The Services Agreement between the parties dictated that leadership and ownership of the project was to be by BES. Thus, ECX was to be run and operated by BES, with only operational and technological services from L2L.

27. However, BES, upon information and belief has made no public statements about ECX and in no way has publicly controlled or taken a leadership role in ECX. Sztorc on the other hand, has taken on the figurehead role for the hardfork, at least publicly.

28. According to the Services Agreement, BES is a not-for-profit organization.

29. The sole director of BES is Diana Aidee Muñoz Maclao de Camargo who has served as the sole director of BES from its formation to the present. Ms. Muñoz has also, upon information and belief, served as the director of multiple other corporations, including Minevra Operations Ltd., another British Virgin Island corporation (with the same listed official address as BES), and FTX Trading Ltd., alongside Samuel Bankman-Fried. As such, Ms. Muñoz appears to be nothing more than a nominal director of BES.

30. Upon information and belief, Ms. Muñoz has not taken any public action to further, administer, or effectuate the ECX hardfork.

31. Upon information and belief, Sztorc's actions have fallen outside the scope of L2L's contracted role on the hardfork and in L2L's contractual relationship with BES.

32. Thus, upon information and belief, Sztorc is an independent actor here – and has taken on the role, independent from his role as CEO of L2L, and independent from any contractual relationship he has with BES, to lead and shape the ECX hardfork.

33. Upon information and belief, from the project's inception, Sztorc has and continues to direct, control, and shape the ECX project.

34. The word "reassigning" is significant: it confirms that the ECX coins in question were first assigned, by the fork's own 1:1 design, to the Patoshi-pattern addresses, and that Defendants L2L and Sztorc then intervened to redirect (or "reassign") those coins to L2L's pre-launch investors. This intervention is not a design choice about initial allocation; it is a post-allocation diversion.

35. On August 7, 2026, Sztorc announced via another X post that the ECX fork would proceed in three stages rather than a single launch. The Alpha launch was scheduled for August 23, 2026 at block height 963,648. Attached as Exhibit D.

36. The Beta launch is scheduled for September 20, 2026 at block height 967,680. The permanent full chain launch is scheduled for October 31, 2026 at block height 973,728.

37. Further, in the same X post dated August 7, 2026, Sztorc noted that "[t]his fork has **opt-in** replay protection. Our software **will** add RP for you (and it will warn you about it). However, if you ignore us, we will replay your txns[3]. So – you must intentionally split your ECX off, or it will follow your outgoing BTC to a new owner." Exhibit D.

38. In the hard fork context, "replay protection" refers to a technical safeguard built into a forked blockchain to prevent a transaction made on one chain from being automatically duplicated and executed on the other chain. Specifically, replay protection modifies the transaction

[3] "txns" is short for "transactions."

format on the new chain so that a transaction signed for Bitcoin is not valid on the new fork, and vice versa. It is typically implemented by adding a chain-specific identifier to the transaction signature, so that the cryptographic signature that authorizes a Bitcoin transaction is mathematically different from the one that would authorize the equivalent transaction on the new fork, even if everything else about the transaction is identical. It is standard practice for Bitcoin hard forks is to build replay protection directly into the new chain's protocol, making it automatic and mandatory.

a. When a Bitcoin hard fork occurs, both the original chain (Bitcoin) and the new chain (ECX) share identical transaction history up to the snapshot block.

b. At the moment of the fork, both chains recognize the same wallet addresses, the same private keys, and the same transaction format.

c. This means that a transaction signed and broadcast on one chain is, technically, a valid transaction on the other chain as well because the underlying cryptographic format is identical.

d. Without any protection against this, if a transferor sends Bitcoin to someone after the fork, that same transaction could be "replayed" on the ECX chain, simultaneously moving the transferor's ECX to the same recipient, even if the transferor never intended to send ECX at all.

39. Defendants L2L and Sztorc have made replay protection optional: users must affirmatively activate it in the official ECX wallet. Sztorc's warning, "if you ignore us, we will replay your txns" means that any user who sends Bitcoin after the fork without running the ECX wallet software and affirmatively enabling replay protection risks having that transaction automatically executed on the ECX chain as well.

40. By designing replay protection to be an "opt-in" rather than mandatory feature, Defendant L2L and Sztorc is designing ECX to track and mirror Bitcoin activity as closely as possible. As a result of this design, the two chains are not independent assets with no relationship to each other; they share a ledger, they share an address space, and they share transaction history.

41. Since the filing of the original complaint, Defendant Sztorc has made additional public remarks regarding ECX, clarifying that the Alpha launch is a "practice" round and not conclusive with respect to a recipient's rights and claims to ECX.

42. Specifically, on August 21, 2026, Defendant Sztorc posted on X that "the phased launch means you have **plenty of time** to learn & practice. You have until *end* of alpha (Sept 20) to learn how the *alpha* works." Attached as Exhibit E. Sztorc also wrote on August 22, 2026, "There is *No Rush* -- even if you want to participate in Alpha, you have until the *end* of the alpha to do so -- (around Sept 20th)." Attached as Exhibit F.

43. Sztorc further explained that the ECX Alpha release is part real but also "fake enough to be less stressful, to allow people more time to think, and plan, and enjoy the end of summer." Attached as Exhibit G.

44. These representations make clear that the ECX distribution becomes permanent and irrevocable on October 31, 2026, and not beforehand.

45. Upon information and belief, L2L, BES, and/or Sztorc have sold approximately 160,000 ECX coins in a pre-launch private placement for a price of approximately $31.25 per ECX, generating a total of approximately $5,000,000. Plaintiffs' total estimated ECX entitlement across the Subject Addresses is approximately 1.1 million ECX coins, of which Defendants L2L and/or Sztorc proposes to divert approximately 500,000 coins to the John Doe Investors.

46. Upon the announcement of the ECX redirection plan on April 24, 2026, Defendants L2L and Sztorc received immediate, widespread, and specific public notice from the Bitcoin community that the plan was widely regarded as improper and legally untenable.

47. For example, Peter McCormack, a prominent Bitcoin investor and podcast host with a large following, posted on X on April 24, 2026 in reply to Sztorc's announcement: "Taking Satoshi coins is theft and disrespectful." [4]

48. Other community members publicly characterized the redirection as a violation of Bitcoin's foundational principle of property immutability, stating that "for the first time, a fork would rewrite wallet balances without owner consent" and warning that "this sets a dangerous precedent."[5] CoinDesk[6], Yahoo Finance[7], and other major financial media covered the backlash prominently, reporting on the widespread characterization of L2L's distribution scheme as "theft."

49. Defendants were therefore on actual, documented, and widely-published notice that the cryptocurrency community broadly regarded the Patoshi-pattern address redirection as an improper taking of property belonging to others. Defendants proceeded with the plan notwithstanding that notice, including by, upon information and belief, executing a pre-launch private placement of approximately 160,000 ECX coins derived from the Subject Addresses.

**<u>The Patoshi-Pattern Addresses and Plaintiffs' Title Thereto</u>**

50. The Patoshi-pattern addresses are a set of approximately 30,000 Bitcoin wallet

---

[4] https://x.com/petermccormack/status/2047688838785745089?s=46&t=Tihtt8mhCKrIPBsbRvSK1w
[5] "What Is The eCash Fork?," *The Bitcoin Manual*, May 17, 2026, available at https://thebitcoinmanual.com/articles/ecash-fork/
[6] "A long-time developer wants to split Bitcoin blockchain and reassign Satoshi coins. The community is called it a theft," *CoinDesk*, April 27, 2026, available at https://www.coindesk.com/tech/2026/04/27/a-long-time-developer-wants-to-fork-bitcoin-and-reassign-satoshi-coins-the-community-is-calling-it-a-theft
[7] Kamina Bashir, "Critics Push Back Against Developer's Plan to Reassign Satoshi's Coins in eCash Fork," *Yahoo Finance*, April 28, 2026, available at https://finance.yahoo.com/markets/crypto/articles/critics-push-back-against-developer-042920049.html

addresses identified through analysis of the nonce[8] values and mining patterns in the earliest Bitcoin blocks. Researchers have attributed these addresses to the original Bitcoin miner, widely believed to be the pseudonymous "Satoshi Nakamoto." These addresses collectively hold approximately 1.1 million Bitcoin that have not moved since the earliest days of the Bitcoin network and have remained dormant for more than sixteen years.

51. Plaintiffs identified, *inter alia*, the Subject Addresses through a lawful algorithmic methodology. Following identification, Plaintiffs undertook comprehensive compliance with Article 7-B of the New York Personal Property Law.

52. Plaintiffs' Article 7-B compliance included: (a) deposit of identifying records for the Subject Addresses with the New York City Police Department, 17th Precinct, across three separate USB drive submissions approximately 19, 15, and 14 months before filing, each accepted without objection and confirmed by a property custody receipt issued pursuant to N.Y. Pers. Prop. Law § 252; (b) direct on-chain notice to each Subject Address via OP_RETURN transaction, embedding notice directly in the Bitcoin blockchain at each address; and (c) a global press release distributed to more than 820 media outlets across 37 countries with a combined readership and viewership of up to 225 million people.

53. Specifically, in February 2025, Noah Doe engaged a strategic consultant to assist in the development of a plan to reach out to any owners of the found addresses to provide them with notice regarding the wallets' abandonment and to detect any wallets that may have been incorrectly grouped with the found addresses.

54. In March 2025, Noah Doe also engaged an independent third-party

---

[8] A term used in cryptocurrency mining, "nonce" is short for "number used only once" and is a 32-bit number that Bitcoin miners adjust repeatedly to produce a block hash below Bitcoin's network difficulty target, ensuring consistent block creation. *See* "Understanding Blockchain Nonce: Essential to Bitcoin Mining," *Investopedia*, May 20, 2026, available at https://www.investopedia.com/terms/n/nonce.asp

cyber/blockchain expert to review the found property and to assist with contacting any potential owners of the found addresses. The expert confirmed that the found addresses validly exist on the blockchain, contain digital assets, and have been dormant or inactive for at least five (5) years.

55. On or about June 22, 2025, Noah Doe directed the cyber/blockchain expert to send messages to the owners of the found addresses and for the Strategic Consultant to host a webpage with notice to wallet holders. Some test messages were sent at the end of June 2025. From June 30, 2025, through July 10, 2025, under Noah Doe's direction, the expert sent a message to each wallet via an advanced blockchain software technique (known as an OP_RETURN) which enables a party to insert tokens into the digital address. The message directed each wallet holder to a webpage that contained a notice (the "Abandonment Notice"). The messages were transmitted to each and every found address, including the Subject Addresses.

56. The Abandonment Notice stated that the subject digital wallet was deemed abandoned based on certain criteria. It provided several ways in which owners could show that the wallet was not abandoned, including a form that could be used, anonymously or not, to assert ownership. The Abandonment Notice also provided 90 days, until October 10, 2025, for any wallet owner to act to show the wallet was not abandoned. The Abandonment Notice remains accessible to this day. The Abandonment Notice also served to inform any wallet owner of Noah Doe's constructive possession and preserved Noah Doe's ownership rights, assuming no owner took action to show the wallet is not abandoned or otherwise claimed ownership.

57. On August 2, 2025, Noah Doe directed the Strategic Consultant to issue a global press release so that all wallet owners would be aware of the Abandonment Notice. On or about August 7, 2025, the press release was issued. Over 820 media outlets in 37 countries published the release or a story based on the release. Based on circulation of these media outlets, it is estimated

that the story reached up to 10 million people directly and up to 225 million people indirectly via secondary impressions such as word of mouth, news reports after the first wave, and exposure after initial publication because internet stories remain online for months or years after initial publication. Media who published the story included CoinDesk (referred to as the "Wall Street Journal of digital currency"), Bitcoinist, Yahoo Finance, and Investing.com.

58. Galaxy Digital, one of the world's largest financial firms focused specifically on digital assets, wrote and circulated a report to all its clients and the public concerning the Abandonment Notice.

59. On December 1, 2025, Noah Doe transferred his ownership rights to all but 18 of the found addresses to Plaintiff ABC Company. ABC Company then transferred some of the rights in the found addresses to Plaintiff XYZ Company. The three Plaintiffs collectively have all ownership rights in the found addresses, including the Subject Addresses.

60. On March 11, 2026, Plaintiffs filed a declaratory judgment action in the Supreme Court of the State of New York, New York County, to affirm their rights to the found addresses, including the Subject addresses. The New York proceeding is captioned *ABC Company et al. v. John Does*, 153119/2026.

**The Economics of Fork Sponsorship and L2L's Inequitable Distribution Plan**

61. In general, a fork sponsor's distribution of new tokens to 100% of Bitcoin holders is the commercial mechanism by which the fork sponsor captures Bitcoin's network effects, including its existing user base, market credibility, and brand recognition, making the forked chain commercially viable.

62. By distributing ECX to 100% of Bitcoin holders at the snapshot block height, Defendants L2L, BES, and Sztorc acquire: (a) an instant, distributed user base of approximately

58 million non-zero Bitcoin wallet addresses, whose holders receive ECX automatically and become immediate participants in the ECX ecosystem; (b) an instant market capitalization derived from that distributed holder base, enabling ECX to trade on exchanges from day one with organic liquidity; and (c) the credibility, recognition, and market trust of the Bitcoin network, which Defendants L2L, BES, and Sztorc exploit by positioning ECX as a Bitcoin-compatible, Bitcoin-enhancing chain rather than a standalone competitor.

63. Upon information and belief, Defendants L2L, BES, and Sztorc chose to fork Bitcoin specifically because the proportional distribution mechanism allows them to capture these benefits.

64. Upon information and belief, The ECX fork is designed to compete with Ethereum and Solana on smart contract and programmable finance use cases, while leveraging Bitcoin's brand and network.

65. Plaintiffs' Subject Addresses are part of the Bitcoin ecosystem that gives ECX its market value. Their inclusion in the Bitcoin holder universe at the snapshot block height contributes to the fork's aggregate market capitalization, supply legitimacy, and distribution breadth — the same benefits Defendant L2L derives from every other Bitcoin address. Defendants L2L and Sztorc retain the full commercial benefit of the Subject Addresses' participation while refusing to pay Plaintiffs the same consideration — the ECX allocation — that every other Bitcoin holder receives for that participation.

66. The so-called "manual reassignment" of the ECX allocation attributable to the Subject Addresses has unjustly benefited Defendants L2L and Sztorc by serving as an inducement to the John Doe Investors to invest in ECX coin that L2L sponsors, refusing to pay Plaintiffs the same consideration given to all other Bitcoin holders, and depriving Plaintiffs from the opportunity

to participate in the ECX ecosystem in a manner consistent with their ownership of the Subject Addresses. And as a result of selling the coin, L2L benefits from not having to sell stock or any other instrument in order to raise funds.

67. Defendants interfered with Plaintiffs' property – ECX allocation attributable to the Subject Addresses – without authorization by intentionally exercising dominion and control over the ECX authorization and did do in derogation of Plaintiffs' rights thereto.

**FIRST CAUSE OF ACTION**
**Unjust Enrichment**
**(against LayerTwo Labs, Inc., Sztorc, and BES)**

68. Plaintiffs repeat and incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

69. Defendants L2L, BES, and Sztorc have been unjustly enriched, and will be further enriched, at Plaintiffs' expense and to Plaintiffs' detriment.

70. Upon information and belief, Defendants L2L, BES, and Sztorc have sold approximately 160,000 ECX coins in a pre-launch private placement at a price of approximately $31.25 per coin, for total gross proceeds of approximately $5,000,000. The 160,000 coins are drawn from the ECX allocation that, under Defendants Sztorc's own announced 1:1 distribution design, was attributable to the Patoshi-pattern addresses, including the Subject Addresses held by Plaintiffs.

71. Upon information and belief, Defendant L2L has already received approximately $5,000,000 in cash proceeds by selling coins that, under its own distribution formula, should have been attributed to Plaintiffs' addresses.

72. Furthermore, upon the Alpha launch on August 22, 2026, Defendant L2L's remaining pre-launch investors and supporters received additional ECX tokens likewise drawn from the Subject Addresses' allocated share.

73. By virtue of making pre-launch sales, Defendant L2L has taken steps to frustrate a future judgment in this action.

74. Defendants L2L, BES, and Sztorc itself receives, and continues to receive, the full commercial benefit of the Subject Addresses' participation in the Bitcoin ecosystem, including the market capitalization, supply legitimacy, and distribution breadth their inclusion generates, without paying Plaintiffs the consideration it pays every other Bitcoin holder for that participation.

75. This enrichment is unjust and occurs at Plaintiffs' expense. The ECX tokens directed to the John Doe Investors are the tokens that, under L2L's own 1:1 distribution rule, would have been attributed to the Subject Addresses. Defendants' use of the term "reassigning" confirms that these tokens were first assigned to the Subject Addresses under the fork's design, and then diverted away. This diversion is to the Plaintiffs' detriment as it deprives Plaintiffs from the opportunity to participate in the ECX ecosystem.

76. Permitting Defendants to retain this benefit is against equity and good conscience. Defendants have adopted Bitcoin wallet address presence as the criterion for ECX entitlement, applied it to 99.95%+ of all Bitcoin wallets, and selectively withheld it from Plaintiffs' addresses without principled justification. The selective exclusion of Plaintiffs, while retaining the full benefit of their addresses' participation, constitutes unjust enrichment.

**SECOND CAUSE OF ACTION**
**Conversion**
**(against All Defendants)**

77. Plaintiffs repeat and incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

78. Upon information and belief, Defendants L2L, BES, and Sztorc have sold at least approximately 160,000 ECX coins in a pre-launch private placement at a price of approximately $31.25 per coin, for total gross proceeds of approximately $5,000,000, to the John Doe Investors. The 160,000 coins are drawn from the ECX allocation that, under Defendants Sztorc's and L2L's own announced 1:1 distribution design, was attributable to the Patoshi-pattern addresses, including the Subject Addresses held by Plaintiffs.

79. At all relevant times, Plaintiffs have held and hold legal title to the Subject Addresses and corresponding ECX distribution on a 1:1 basis, pursuant to Article 7-B of the New York Personal Property Law.

80. Without authorization or justification, Defendants intentionally exercised dominion and control over the corresponding ECX distribution belonging to Plaintiffs inconsistent with and in derogation of Plaintiffs' rights, by "manually reassigning" and making actual sales of ECX coins from within the ECX distribution corresponding to the Subject Addresses to the John Doe Investors.

81. Without authorization or justification, the John Doe Investors, intentionally exercised dominion and control over the corresponding ECX distribution belonging to Plaintiffs inconsistent with and in derogation of Plaintiffs' rights, by purchasing pre-launch ECX coins from within the ECX distribution corresponding to the Subject Addresses.

82. Defendants' unauthorized dominion and control over the ECX distribution has and continues to deprive Plaintiffs of possession for an indefinite period of time.

83. In the absence of preliminary equitable relief, Defendants' unauthorized dominion and control over the ECX distribution will permanently deprive Plaintiffs of possession.

84. As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered irreparable harm and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for judgment as follows:

(a) A temporary restraining order and preliminary injunction, pursuant to Fed. R. Civ. P. 65, postponing the Alpha phase launch of the ECX fork scheduled for August 23, 2026, pending final judgment in this action or further order of the Court;

(b) As an alternative to subparagraph (a) above, a temporary restraining order and preliminary injunction requiring Defendants to place the ECX allocation attributable to the Subject Addresses in a court-supervised, three-party multi-signature escrow wallet, to be maintained pending final judgment in this action or further order of the Court;

(c) A permanent injunction prohibiting Defendants from distributing, transferring, or otherwise disposing of the ECX allocation attributable to the Subject Addresses to any party other than Plaintiffs, absent a final judgment determining Plaintiffs do not hold title to the Subject Addresses;

(d) An order imposing a constructive trust on the ECX allocation attributable to the Subject Addresses, directing that such allocation be held for the benefit of Plaintiffs pending confirmation of title;

(e) An award of compensatory damages for any ECX allocation that has been distributed to third parties prior to the entry of injunctive relief, in an amount to be proven at trial;

(f) An award of disgorgement of any profits Defendants have received from the pre-launch sale of ECX coins attributable to the Subject Addresses;

(g) An award of Plaintiffs' reasonable attorneys' fees and costs to the extent permitted by law; and

(h) any such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury.

*Respectfully submitted*,

**THE PLAINTIFFS,**
**Noah Doe, ABC Company &**
**XYZ Company**

Dated September 11, 2026
New Haven, CT

BY: /s/ David D. Lin

David D. Lin, *pro hac vice*
LEWIS & LIN LLC
77 Sands Street, 6th Floor
Brooklyn, NY 11201
David@ilawco.com
Tel: (718) 243-9323
Fax: (718) 243-9326

Sean R. Caruthers (ct27606)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
E-Mail: scaruthers@npmlaw.com
Tel: (203) 821-2000
Fax: (203) 821-2008